UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

EUGENE FRAZIER, JR.                      CIVIL ACTION NO. 06-cv-0312

VERSUS                                    JUDGE STAGG

WARDEN LOUISIANA STATE                   MAGISTRATE JUDGE HORNSBY
PENITENTIARY

# REPORT AND RECOMMENDATION

## Introduction

A Sabine Parish jury convicted Eugene Frazier, Jr. ("Petitioner") of two counts of
simple burglary. Petitioner received an enhanced 30-year sentence pursuant to Louisiana
habitual offender laws. Petitioner pursued a direct appeal and a post-conviction application.
He now seeks federal habeas corpus relief on several grounds.

## Sufficiency of the Evidence

### A. Standard of Review

Petitioner argues that the evidence was not sufficient to support his convictions. In
evaluating the sufficiency of evidence to support a conviction "the relevant question is
whether, after viewing the evidence in the light most favorable to the prosecution, *any*
rational trier of fact could have found the essential elements of the crime beyond a reasonable
doubt." Jackson v. Virginia, 99 S.Ct. 2781, 2789 (1979). The trier of fact has broad
discretion to "resolve conflicts in testimony, to weigh evidence, and to draw reasonable
inferences from basic facts to ultimate facts." Id. The Jackson inquiry "does not focus on

whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." <u>Herrera v. Collins</u>, 113 S.Ct. 853, 861 (1993).

The Louisiana appellate court invoked, recited and applied the <u>Jackson</u> standard on Petitioner's direct appeal, so its decision was not "contrary to clearly established Federal law," and Petitioner can obtain habeas relief only if the State court's decision was an "unreasonable application" of <u>Jackson</u>. 28 U.S.C. § 2254(d); <u>Williams v. Taylor</u>, 120 S.Ct. 1495, 1523 (2000); <u>Santellan v. Cockrell</u>, 271 F.3d 190, 193 (5th Cir. 2001).

Under the unreasonable application clause, a federal court is permitted to grant the writ if the state court has identified the correct governing legal principle from the Supreme Court's decisions but unreasonably applied that principle to the facts of the prisoner's case. <u>Williams</u>, 120 S.Ct. at 1523. Even if the federal court, in its independent judgment, has a firm conviction that the state court was incorrect in its application of a federal constitutional principle, that alone does not permit the federal court to grant habeas relief. Relief is not permitted unless the state court decision was so wrong as to be objectively unreasonable. <u>Lockyer v. Andrade</u>, 123 S.Ct. 1166, 1175 (2003). And it is only the state court's ultimate decision, not the quality of its analysis or opinion, that is at issue. <u>Neal v. Puckett</u>, 286 F.3d 230, 246 (5th Cir. 2002)(en banc).

**B.  The Evidence**

John Adair and his cousin, Marcella Adair Tramel, testified that they each owned houses, located about 100 feet apart in Sabine Parish.  The homes were vacant at the relevant time but did contain items of property.  Mr. Adair testified that on December 3, 1997, he discovered that the homes had been broken into.  The front door of his home had been kicked in, and the back door had been kicked in on his cousin's house.  A space heater was missing from Mr. Adair's house, and a bathroom sink and water heater were missing from Ms. Tramel's house.  Mr. Adair, a part-time deputy, called Detective Jack Staton to come to the scene.

Mr. Adair noticed a shoe print on his broken front door, and he took the door to the district attorney's office as potential evidence.  He identified the door at trial and testified that it was in essentially the same condition at the time of trial as when he found it the night he discovered the burglaries.  The owners of both houses testified that they did not know Petitioner and had not given him or anyone else permission to enter their homes or remove any items.  They also identified photographs of the stolen items that were recovered by sheriff's deputies.  Tr., Vol. 1, 61-77.

Cynthia York testified that she and her husband were driving on Wiley Road on the evening of December 3, 1997 when a man flagged them down.  The young black man introduced himself as Eugene Frazier, and he said that his car was stuck.  The Yorks were in a small car and could not help, but they told Frazier that their son was traveling behind

them in a truck and could help him. Ms. York testified that this incident occurred within sight of the two burglarized homes. Tr. 77-79.

Harvey York, Jr. identified Petitioner as the man who flagged him down and identified himself as Butch Frazier. York said that Frazier's car was stuck just off Wiley Road on a small side road. York managed to free Frazier's car, but then York's truck ran out of gas. Petitioner drove York to York's mother's house and dropped him off. York testified that he did not see any of the stolen items in Petitioner's car, but he did report seeing a blanket in the back seat of the Cadillac car. Tr. 79-82.

Diane Williams testified that she moved into a new home in early December of 1997. Williams testified that she has 10 children, two of whom live with her, and she needed some items such as a heater, water heater, and a "face bowl" (bathroom sink) for the house. Williams testified that she had known Petitioner all of her life, and she was talking to him when he asked what she needed for her house. Ms. Williams listed the items, and Petitioner reportedly said, "Well, I will get it for you." Petitioner had a television and VCR in his car that he offered, but Ms. Williams declined because she already had those items. Petitioner said that he was involved in tearing down some old houses and should be able to get the items Ms. Williams needed.

Petitioner brought Ms. Williams a large heater on the same day he made his offer. Ms. Williams testified that Petitioner and his cousin, Betty Garner, brought her the heater, and Ms. Williams gave Petitioner $20. The next evening, Ms. Williams testified, she and

some other people were in a car when Petitioner blew the horn of his car and got them to pull over. Petitioner stated that he had just dropped off on Ms. Williams' back porch a water heater, a face bowl and a small white heater (not reported as stolen). Ms. Williams said that she handed petitioner $30 for those items. As Petitioner drove away, Detective Jack Staton approached from the opposite direction, saw Petitioner, turned around and stopped Petitioner.

Williams admitted to prior convictions, including for thefts, but she said she did not think the items were stolen because she had seen Petitioner at the site of an old house that Chief of Police Marvin Frazier was demolishing. Ms. Williams admitted on cross-examination that she had written in an early statement to police that she paid $40 for the items, but she testified that was a mistake and the actual price was $50. Tr. 82-120.

Iseola Kimbrough and Albert Williams were in the car with Diane Williams when Petitioner stopped them to report that he had what Ms. Williams needed. Neither witness reported seeing Ms. Williams give Petitioner any money. Albert Williams testified that they went to Diane Williams' house to see what had been left on the porch, and he saw a heater, face bowl, and water heater. Albert Williams testified, consistent with Diane Williams' earlier testimony, that Diane told him that the police were coming to pick up the items. Albert testified that he helped Ms. Williams move the items to Ms. Williams' sister's house, where officers did pick up the items. Ms. Williams testified that she made that arrangement because she was not going to be home when the officers arrived. Tr. 120-35.

Zwolle Chief of Police Marvin Frazier testified that he was Petitioner's cousin. Chief Frazier says that he had a side job tearing down old houses and doing other work of that nature. He was tearing down a house in early December 1997, and Petitioner did come to that house but was not working on the demolition job. Chief Frazier testified that he gave Petitioner a small, white bathroom heater from the house, which he learned Petitioner later gave to Diane Williams. The sheriff's office originally seized that heater along with the other items, but the Chief identified its source, and it was returned to Ms. Williams. Chief Williams said that Petitioner had visited the site of the demolition job on the evening before he got arrested. Chief Frazier also recalled that he gave Diane Williams some lumber from the site when she stopped by one day before Petitioner had been on the site. Tr. 136-41. (Diane Williams had testified that she and Petitioner had been at the site at the same time and in the presence of the Chief.)

Sabine Parish Sheriff's Deputy Jack Staton did not explain why he stopped Petitioner, but he testified that he did stop Petitioner and asked him to go with him to take a picture of his tennis shoes. Staton identified the photograph. Staton testified that he took the Polaroid photograph to the Adair house and, using a flashlight, he compared it to a print on the front door of the house. (Presumably, this was done before Adair removed the door and took it to the district attorney's office.) As a result of the comparison, he called the jail (where Petitioner had apparently been taken in the interim) and asked that Petitioner's shoes be taken into evidence. Staton learned that Diane Williams had received items of the kind taken from

the houses, and he called her. Ms. Williams cooperated and arranged for the items to be picked up at her sister's house. Tr. 142-46.

Ted DeLacerda, an investigator for the district attorney's office, testified that he and the prosecutor called the crime lab and asked how to develop a footprint using a shoe. DeLacerda described the process that was used to take the print. He testified that, as a result of what was revealed, the door, impressions, and the shoes were sent to the crime lab. Tr. 152-59.

Richard Beighley, a criminalist with the crime lab, was qualified as an expert in criminalistics, specifically in the area of footwear comparisons. He testified that he did not find any shapes left in the print on the door (which was a very good quality print) that were inconsistent with shapes left as impressions by Petitioner's shoe. Beighley demonstrated the comparison in the courtroom. Beighley said that he was not testifying that the shoe print was caused by the seized shoe, but it was his opinion that the impression on the door had similar shape, design, and wear characteristics to the tread of the left tennis shoe taken from Petitioner, so the print on the door could have been made by that shoe. Tr. 159-70.

**C. Analysis**

Petitioner was charged with simple burglary, then defined by La.R.S. 14:62 as the "unauthorized entering of any dwelling, vehicle, watercraft, or other structure, movable or immovable, with the intent to commit a felony or any theft therein." Petitioner argued on direct appeal that there was no direct evidence to prove that he entered either structure so,

under state law regarding circumstantial evidence, the prosecution had to exclude every reasonable hypothesis of innocence to convict. See La.R.S. 15:438.[1] The appellate court reviewed the testimony discussed above, noted the jury's role in credibility assessment, and determined that there was sufficient evidence under Jackson (and in light of Section 438) for the jury to have reasonably found the essential element of an "unauthorized entry" of the structures. Tr., Vol. 2, 387-91.

Petitioner argues that Diane Williams was not credible because of her prior theft convictions, her exposure to prosecution as a multiple offender if she were found guilty of a crime in connection with the burglaries, and the discrepancy in her testimony of whether she paid $40 or $50 for the items. Williams testified at trial that Petitioner brought her a heater one day and, on the next day, brought her the small white water heater and other items. Tr. 86-87. She wrote in her statement to Detective Staton, however, that the white heater had been delivered first, and the other items later. Petitioner urges that Williams' trial testimony that he delivered the stolen heater on the day before the burglaries were discovered is a strong point in his favor. It is an inconsistency.

Petitioner's arguments go to credibility determinations. Such decisions are squarely within the province of the jury, and "[a] all credibility choices and conflicting inferences are

---

[1] A federal habeas court does not apply the Louisiana circumstantial evidence standard found in La.R.S. 15:438. Only Jackson need be satisfied, even if state law would impose a more demanding standard of proof. Foy v. Donnelly, 959 F.2d 1307, 1314 n.9 (5th Cir. 1992).

to be resolved in favor of the verdict." Ramirez v. Dretke, 398 F.3d 691, 695 (5th Cir. 2005). "[U]nder Jackson, the assessment of the credibility of the witnesses is generally beyond the scope of review." Schlup v. Delo, 115 S.Ct. 851, 868 (1995). The jury was presented with a case of circumstantial evidence that rested in significant part on the testimony of Diane Williams, who was of debatable credibility and was not 100% consistent on all points. The jury observed Williams as she testified on direct and cross-examination, considered the other evidence, and elected to return verdicts of guilty. There might be room for debate among reasonable jurors, if they were deciding the case anew, as to the appropriate verdict, but the guilty verdict rendered was certainly a rational decision, and the state appellate court affirmed after a reasoned application of the Jackson standard. This court may grant habeas relief with respect to the claim only if the state court's application of Jackson is not only incorrect but also objectively unreasonable. The undersigned finds that the appellate court's considered application of Jackson was a proper, conscientious, and reasonable application of that demanding standard, so it is recommended that habeas relief be denied with respect to this claim.

**Amended Bill of Information**

Petitioner was originally charged with burglary of an inhabited dwelling. The case came up for trial on March 4, 1998, and the prosecutor amended the bill of information to charges of simple burglary of a structure. Defense counsel asked for arraignment on the amended charge, and Petitioner entered a plea of not guilty. The court set a new trial date

of June 15, 1998. A second arraignment was held on March 25, 1998. The trial date remained June 15, 1998. See Minutes at Tr., Vol. 3, 573-77. In April 1998, the court heard a motion for preliminary examination, motion for discovery, a motion to quash, and a motion to suppress, among other various matters brought before the court. Tr. 578-79. A pretrial conference was held, and the State announced the case ready for trial. Tr. 580. The trial began on June 17, 1998.

Petitioner argues that the amendment of the bill of information somehow denied him the protections of the Sixth and Fourteenth Amendments. The district attorney may, in cases which do not carry a sentence of death or life imprisonment, institute prosecution by a written bill of information. La.C.Cr.P. art 382. Petitioner was billed, then billed again for a less serious crime, and he was afforded a full opportunity to be arraigned and engage in pretrial proceedings with respect to the charges on which he ultimately went to trial.

Defense counsel filed a motion to quash and argued that Petitioner should have been allowed to go to trial on the original charges (on which he likely would have been acquitted because of lack of evidence the houses were inhabited). Counsel argued that the amendment was not in accordance with Louisiana law and that the prosecutor should have dismissed the original charge and filed a new one. The trial judge disagreed and found that the prosecutor's actions were consistent with Louisiana law. Tr. 1264-73. When the issue was raised again on post-conviction application, the trial judge once again denied relief. Tr. 706. The appellate court simply stated, with respect to this and several other issues, that it found

"no error in the ruling of the trial court." Tr. 682. The Supreme Court of Louisiana denied writs without comment. Tr. 595.

The sufficiency of a state indictment or bill of information is not a matter for federal habeas corpus relief unless it can be shown that the charging instrument "is so defective that the convicting court had no jurisdiction." Morlett v. Lynaugh, 851 F.2d 1521, 1523 (5th Cir. 1988). For a charging instrument to be fatally defective, no circumstances can exist under which a valid conviction could result from facts provable under the instrument. State law is the reference for determining sufficiency and if the issue "is presented to the highest state court of appeals, then consideration of the question is foreclosed in federal habeas corpus proceedings." Morlett, supra. See also Wood v. Quarterman, 503 F.3d 408, 412 (5th Cir. 2007); McKay v. Collins, 12 F.3d 66, 68-69 (5th Cir. 1994). The charging instrument in this case was presented to the state's highest court, so there is no basis for habeas relief with respect to this issue.

**Brady Claim**

Petitioner claims that the State violated his rights under Brady v. Maryland, 83 S.Ct. 1194 (1963) when it did not disclose to the defense prior to trial that Diane Williams and the State had a deal that Williams would testify against Petitioner in exchange for no charges being lodged against her or, at least, favorable consideration would be afforded Williams. Petitioner bases his claim on perceived inconsistencies in Williams' testimony, especially with regard to the dates on which the stolen items were delivered, and Williams' history of

theft convictions and potential to face a multiple offender enhancement if she were convicted of the burglaries. An evidentiary hearing was held in state court on the post-conviction application. The judge asked the attorney who represented Petitioner at the hearing if there was any evidence regarding an alleged deal with Diane Williams. Counsel responded:

> I think the record, as my client stated earlier, speaks for itself. Diane Williams admitted on the stand that she had a criminal history.

Tr. Vol. 1, 34-35. Counsel added that Williams was not cross-examined about the fact that she faced no criminal liability in connection with her receipt of the stolen items. Anna Garcie, one of the two trial prosecutors, testified at the hearing that there was no deal or leniency "at all" given to Williams in exchange for her testimony. Garcie specifically denied that Williams was given any immunity, promises that certain cases would not be pursued, or promises of a more lenient sentence on any pending case. Tr. 39-40.

The trial judge found that there was no evidence to support Petitioner's allegations of any kind of deal with Diane Williams, and he denied the <u>Brady</u> claim based on that lack of evidence. Tr. Vol. 4 at 705-06. The higher state courts summarily denied relief with respect to that ruling.

The state court resolved the issue based largely on a determination of a factual issue. That determination "shall be presumed to be correct," and Petitioner has the "burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Petitioner has not pointed to any evidence that might satisfy that burden; he

merely repeats his arguments that Williams' testimony should not be deemed credible and that she had strong motivation to make a deal with prosecutors. Such bold assertions, unsupported by specific facts that if proved would satisfy Petitioner's burden, do not warrant further proceedings with respect to this claim.

**Admission of Evidence**

Petitioner argues that the trial court erred in admitting as evidence the door taken from the Adair house. Petitioner makes related arguments that trial counsel was ineffective for failing to object to the admission and appellate counsel was ineffective for failing to pursue the issue on appeal.

The door was admitted into evidence during the testimony of Mr. Adair, the first witness, who testified that the door was in essentially the same condition as it was when he found it the night he discovered the burglaries. The trial judge admitted the door as State Exhibit #4, with no objection from the defense. Tr. 70-73. Trial counsel did object before Investigator DeLacerda took the stand; he argued that DeLacerda should not be allowed to render opinion testimony about the shoe and the print on the door. The trial judge allowed the state to call DeLacerda to lay the foundation for the physical evidence by explaining its collection, the steps taken, and the chain of custody. Tr. Vol. 1, 149-58. Richard Beighley then offered his expert opinion regarding the prints. Tr. 159-70.

Petitioner argues that it is unlikely the door could have been kicked in without causing it greater damage, questions the likelihood of the almost perfect print that was left on the

door, and characterizes the print-comparison process as toying and tampering with the evidence. Petitioner also questions whether there was adequate proof of a chain of custody. The trial judge, in denying the post-conviction application, characterized the argument as one related to the sufficiency of the evidence, which he found was not a proper issue for post-conviction relief. Tr. Vol. 4, 707.

Federal courts do not grant habeas relief based on mere errors in the application of state evidentiary rules or even consider it relevant whether state evidentiary rules were satisfied. Only federal constitutional errors that satisfy the demanding standards of Section 2254 merit habeas relief. The Due Process Clause provides a mechanism for relief when a state court wrongfully admits evidence, but only if the evidence is so unduly prejudicial that it renders the trial fundamentally unfair. Bigby v. Cockrell, 340 F.3d 259, 271-72 (5th Cir. 2003), citing Dawson v. Delaware, 112 S. Ct. 1093 (1992) and Estelle v. McGuire, 112 S.Ct. 475 (1991). If constitutional error is found, a petitioner's claim will still fail absent a showing that the evidence had a substantial and injurious effect or influence in determining the jury's verdict. Bigby, 340 F.3d at 272. For this court to order relief, it must find that the state court performed an objectively unreasonable application of those principles.

The trial evidence was undisputed that the door admitted into evidence was the one taken from one of the burglarized homes. Petitioner has not contested that point. As for the chain of custody, the testimony of Mr. DeLacerda and Mr. Beighley established the path of the door between its removal from the house and trial. There is no basis to find that the trial

judge's admission of the door into evidence was so erroneous as to run afoul of due process. Rather, the admission of the door appears to have been made based on a sound record. Petitioner's arguments go more to the weight of the expert testimony, and they are based largely on speculation and subjective characterization of the testing process. No relief is warranted on this claim.

With regard to the ineffective assistance of counsel claim, trial counsel asked Mr. DeLacerda a single question on cross-examination and had only two questions for Mr. Beighley. Tr. Vol. 1 at 159 and 170. Counsel could have perhaps scored some points by cross-examining Mr. DeLacerda about his lack of training or experience in gathering footprint impressions, but the State's presentation of that evidence was quite candid in that regard and detailed regarding the steps taken by the admittedly inexperienced investigators. Under these circumstances, counsel's performance with regard to the door was not prejudicial under the standard of Strickland v. Washington, 104 S.Ct. 2052 (1984).

Petitioner also argues that appellate counsel should have raised the issue. That form of a Strickland claim requires that the applicant show a reasonable probability that he would have won on appeal had the issue been raised. Smith v. Robbins, 120 S.Ct. 746, 764 (2000); Moreno v. Dretke, 450 F.3d 158, 168 (5th Cir. 2006). The door was an important piece of evidence, but Petitioner has not articulated a valid basis for attacking its admission that would render the trial court's evidentiary ruling erroneous or make appellate counsel

incompetent for not attacking the ruling on appeal (especially considering the lack of contemporaneous objection at trial).

**Right to Confrontation**

After Diane Williams testified for the State, defense counsel cross-examined her about the inconsistency between her testimony and her statement to police about the amount she paid for the items, about prior convictions, and about why Williams took the items to her sister's house after she learned police were looking for the items. Counsel also questioned Williams about her testimony regarding Chief Frazier and the time-frame during which the alleged transactions occurred. Tr. Vol. 1, 99-115.

The prosecutor conducted redirect examination. Defense counsel declined further questioning but asked that Williams remain "under the rule." The court instructed Williams that she was "still under subpoena and that means that you cannot leave at this point, but you can step down." Tr. 120. After the State rested, two defense witnesses were called. Defense counsel then stated, "I would call Diane Williams on cross." There is no transcript of any conversation regarding Williams' whereabouts, but the court reporter entered a parenthetical note as follows:

> Diane Williams was not close by to the courtroom after being called as a witness. The jury viewed all the exhibits that had been offered into evidence at this time.

Tr. 174. Defense counsel called another witness and, after that testimony, announced "that's all the witnesses I have, Your Honor." Tr. 177.

At the post-conviction hearing, Petitioner testified that defense counsel twice tried to recall Williams to the stand but "she wasn't nowhere to be found, she wasn't nowhere in the courthouse" and "[a]fter the Judge done told her she was under subpoena, not to leave." Tr. 29. Petitioner added that the court did not issue a writ of attachment. "They acted like it didn't even happen." Id.

Petitioner argued that it was important that counsel cross-examine Williams about date discrepancies. He argued, on one hand, that Williams' testimony was inconsistent with a written statement that she gave to police. Williams' statement does not, however, specify the date or dates on which the described events happened. Williams wrote that Petitioner asked her if she needed a heater. Williams said yes, and Petitioner reportedly gave her a "white bathroom heater and asked what else I needed and I told him and he said he would be back and that's when he came back with a big heater and hot water heater and face bowl." Williams added that she gave Petitioner "$40 dollars for everything and he left." Tr. Vol. V, 857. The trial judge tried to explain to Petitioner that the statement did not include a date. Counsel was not ineffective, therefore, for not cross-examining Williams further in this vein.

Diane Williams testified repeatedly that Petitioner brought her the large heater (a stolen item) one night and that he delivered the small white heater (not stolen), water heater, and face bowl the next evening, which was the date Petitioner was arrested. The arrest happened on December 3, and it was the prosecution's theory that Petitioner had likely committed the burglaries earlier on December 3 when the Yorks saw Petitioner stuck near

the burglarized homes. Petitioner argues that counsel should have been able to cross-examine Williams as to how Petitioner could have delivered a stolen heater to her on the evening before the burglary was committed. His argument is probably best presented in his testimony found at Tr. 27-28. Petitioner makes a related argument that uncalled witness Myrtis Garner, his then girlfriend, could have provided him an alibi for December 2. Petitioner's argument that it was impossible for him to have sold Williams a stolen heater on December 2 before the burglary occurred on December 3 rests on the assumption that all of the items were stolen on December 3. That was the implied theory of the prosecution, but there was no evidence that the houses were checked before that date. It is possible that Petitioner made more than one trip on different days to the vacant houses. That possibility does not mean that cross-examination on this issue would have been worthless; it merely points out that cross-examination of Williams on this issue would not have been as devastating as Petitioner suggests. Her testimony could have been accurate and still support a finding of guilt. The trial judge noted at the evidentiary hearing that Petitioner was "hanging up" on the date the burglaries happened, but "the date that it was reported was not necessarily the date that it happened" at the abandoned houses. Tr. 37.

At the trial, after counsel attempted to call Diane Williams during the defense case, he did call Schemekia Frazier and ask her about a telephone call. Schemekia testified that Diane Williams had called Schemekia's grandmother's house. Schemekia answered the phone, and Williams asked to speak to Petitioner or another man. The prosecution objected

based on hearsay as to testimony about what Williams said, and defense counsel responded that if the objection stood, "we need to bring her (Williams) back." The trial judge stated that he would let the witness continue, and Schemekia proceeded to testify that Williams said she wanted one of the men to come fix her stove or heater. That ended the direct testimony. Tr. 174-75. After cross-examination of Schemekia by the prosecution, the defense rested without making any other effort of record to re-call Ms. Williams. The trial judge noted this history, as well as the lack of a trial objection that the defense was prejudiced by Williams' absence, in denying the post-conviction application on this issue. Tr. 707.

The record does not support a finding that the state court was objectively unreasonable in determining that the defense was able to cross-examine Ms. Williams to the extent counsel desired. There was no objection or reference to Williams once counsel was able to elicit the hearsay testimony of Williams' statement. There is, therefore, no basis to afford habeas relief on the Confrontation Clause claim.

There is remaining the issue of whether defense counsel was ineffective for not cross-examining Williams more during either the State's case or by insisting that Williams be produced during the defense presentation. Williams was insistent throughout her testimony as to the order in which the items were delivered, and her testimony was not (despite Petitioner's arguments) inconsistent with her written statement to police. Petitioner's proposed cross-examination would be regarding the asserted impossibility that Petitioner delivered the stolen large heater on the day before the burglary was discovered. This does

not appear to be a fertile area for cross-examination.  The witness would likely have simply

insisted that her original and repeated testimony about the delivery times was accurate.  It

would then be up to the defense to argue in closing arguments that the delivery dates were

not consistent with the alleged date of the burglaries.  Petitioner has not exhausted a

Strickland claim based on the lack of such a closing argument (which would have been met

with the rebuttal that Petitioner could easily have made more than one trip to the scene of the

crimes.)  Assuming counsel should have asked Williams additional questions in this area,

prejudice would exist only if there is a reasonable probability that if those questions had been

asked the result of the trial would have been different.  There is no basis for such a finding

or that the state court was objectively unreasonable in its application of Strickland to these

facts.

**Ineffective Assistance of Counsel**

Petitioner argues that his trial counsel was ineffective in several areas.  He asserts that

the cross-examination of Diane Williams was inadequate, and that issue was addressed

above.  He also faults counsel for allegedly failing to submit Diane Williams' written

statement to the jury so that the jury could see the inconsistencies between the statement and

Williams' trial testimony.[2]  Counsel did, however, admit the statement into evidence as

---

[2]Petitioner asserts in his memorandum at page 25 that his bill of information
"states the offense occurred on December 3, 1997, between 9:00 p.m. and the time Frazier
was arrested at 9:43 p.m."  However, a review of the amended bill of information in the
record (Tr. Vol. 7, 1186) shows that it alleged that the burglaries were committed "on or
about the 3rd day of DECEMBER, 1997."  No particular time is mentioned.

Exhibit D-1. Tr. 115-16. Petitioner also argues that his appellate counsel was ineffective for failing to raise the alleged defect in connection with the amended bill of information. Petitioner has yet to make out any legally recognized error with regard to the bill of information and, furthermore, he cannot show prejudice stemming from omission of any such argument. The prosecutor could have, with the stroke of a pen, instituted a new bill of information at any time. The Fifth Circuit has reasoned in cases involving defective grand jury indictments that failure of counsel to attack the indictment may not cause prejudice if a valid indictment could have easily been obtained. See Pickney v. Cain, 337 F.3d 542 (5th Cir. 2003). This situation is analogous.

Petitioner faults counsel for not objecting to the introduction of the door based on what Petitioner characterizes as tampering with and altering of evidence. The record simply does not support Petitioner's characterization of the testing efforts. There is no reasonable basis to believe that an objection would have resulted in the door not being admitted into evidence. Petitioner's arguments go to the weight of the evidence, and the facts he relies upon were fully disclosed to the jury. Counsel also devoted a significant part of his closing argument to attacking the testing process and related testimony. Tr. 183-86.

Petitioner argues that counsel did not adequately cross-examine witnesses. Counsel had no questions for John Adair, Deputy Staton, or Jerry Williams. He had very few questions for witnesses such as Harvey York, Jr., Chief Frazier, Ted DeLacerda, or Richard Beighley. Although Petitioner suggested an area of inquiry that counsel should have made

when examining Diane Williams, he has not articulated any particular questions or areas that should have been explored with the other witnesses. And he certainly has not explained where an absence of cross-examination or more questions of these witnesses creates a reasonable probability that, had the questions been asked, the verdict would have been not guilty. Accordingly, the court cannot say that the state court's adjudication of this aspect of the Strickland arguments was not only wrong but so wrong as to be objectively unreasonable.

Petitioner's principal Strickland argument is that counsel failed to call critical witnesses Glen Frazier, Myrtis Garner, and Stephanie Johnson. Petitioner submitted, with his post-conviction filings, an affidavit from Ms. Garner. She testified that Petitioner was her boyfriend and was with her and her family all night on December 2, 1997.[3] She adds that she went to the jail after the December 3 arrest and was allowed to take Petitioner's car keys and retrieve his car. She states, "I ask Glen Frazier, to look all in the car for us and there were know (sic) blanket in the car." Tr. Vol. 5, 853.

Glen Frazier, Petitioner's first cousin, testified in an affidavit that Petitioner called his home on the night of December 3 and said that he had run out of gas on the Belmont Road. Glen states that he went to help and "didn't see any big heater, hot water heater or any face

---

[3] Garner testifies (with all mistakes in original): "I ... swear that on Tuesday, 12/2/97, my boyfriend Eugene Frazier, was with me and my family all night at my house, and also on Wednesday, 12/3/97, the night of Eugene Frazier, arreste, Jennie Frazier, and I went to the [jail and retrieved Petitioner's car keys]." The testimony is not crystal clear as to the date(s) of the alibi, but Petitioner characterizes the testimony as presenting an alibi for December 2 only. See Doc. 5, pages 13-14.

bowl or blanket in Eugene's car." He adds that as he followed Petitioner back into Zwolle, Deputy Staton asked to speak to Petitioner and looked in the trunk of Petitioner's car. Glen says that he came out of his house and also looked in the car and saw only trash bags of clothes. Glen testifies that he looked in the car again when Myrtis Garner came to get it; he did not see a blanket. Glen testifies that the court did not inform him to be in court on the June 17 trial date or he would have been present to offer this testimony. Tr. 851. Stephanie Johnson testified in an affidavit that she accompanied Glen and observed similar facts. Tr. 856.

Glen Frazier also testified at the evidentiary hearing. He once again testified that Petitioner called him on December 3 because he had run out of gas. Glen testified that he delivered some gas and saw "nothing in the car but some clothes." Glen believed that he delivered the gas at about 10:30 or 11:00 p.m. Glen said that when they left, he stopped at a store and then went home. Petitioner "made a block" before he came to the house, where Deputy Staton examined the car. Glen conceded that he could not testify Petitioner had not been on Belmont Road earlier in the day or even the day before. Glen testified that he never received a subpoena to testify at trial and learned that the trial had been held only when he heard about the conviction. Tr. 9-24.

Petitioner, who did not testify at trial, testified at the evidentiary hearing. He said that after Harvey York pulled him out of the ditch, he was about 10 miles from Zwolle. He drove about four miles and ran out of gas. He went to a nearby home, and the owner let him use

his telephone to call Glen Frazier. The owner later gave Petitioner some gas, and Petitioner began driving toward Zwolle when he met Glen and Stephanie. Petitioner testified that they stopped and added the gas that Glen had brought and proceeded to town. Petitioner testified that Deputy Staton stopped him near the graveyard, as Diane Williams had testified, but allowed Petitioner to take his car to Glen Frazier's house before Petitioner was taken to jail. Staton later returned with a search warrant for the car, but he found no stolen items in it.[4] Petitioner denied that he ever had time to place the items on Diane Williams' porch. Of course, it is too late to consider Petitioner's "merits" testimony other than as background information for assessing the potential benefit of the uncalled witnesses.

Petitioner testified that Stephanie Johnson was not subpoenaed for his trial "because I thought Glen Frazier and his mother was enough." Glen's mother had also been in the car during the gas run. Petitioner testified that the mother passed away, but Petitioner did not make clear when she died relevant to the trial. Petitioner testified that he provided trial counsel with a map and information about his witnesses, but counsel would not investigate Glen Frazier or the other witnesses.

The record shows that defense counsel did subpoena Glen Frazier and nine other witnesses for the June 15, 1998 trial date. Tr. Vol. 3, 530. Stephanie Johnson and Myrtis Garner were not on the list, but Petitioner said that he chose not to subpoena Stephanie

___

[4] It appears that Deputy Staton did not obtain a warrant as Petitioner testified. Rather, Staton obtained from Petitioner a "written consent to search." Tr. 318.

Johnson because he thought he had enough witnesses with Glen Frazier and his mother. Petitioner must live with that decision and not attempt to blame counsel for Petitioner's mistaken assumption. The record shows that a subpoena was issued to Glen Frazier for a June 15, 1998 trial date, and the Sheriff made domiciliary service on June 11 through a Marvin Frazier.  Tr. 548-49.

The subpoenas to Glen Frazier and the other witnesses were for Monday, June 15. For reasons not disclosed in the record, the trial did not actually commence until June 17. The State announced that it was ready to proceed, but defense counsel stated that he had requested a "number of subpoenas" and wanted to first make sure that all of his witnesses were present.  Roll was called, and the court asked if counsel was ready to proceed.  Counsel answered, "Not unless these witnesses are present."  Counsel was then allowed to leave the courtroom and look for the witnesses.  Two were confirmed as scheduled to arrive later, but there were five other witnesses that counsel said he needed.  A check of the record appears to have indicated service returns for the witnesses.  The court asked counsel if he wished a writ of attachment to issue, and the following exchange occurred:

> MR. CALHOUN: We need them and they were subpoenaed to be here at the beginning of this trial, they were subpoenaed for Monday and throughout the week.
>
> MR. STRIDER: Your Honor, I'm sure they were here Monday.
>
> MR. CALHOUN: And I think as all the other witnesses they were instructed to be back on whatever that trial began.
>
> MR. STRIDER: Only if Mr. Calhoun instructed them.

MR. CALHOUN:     I think the subpoena says they are to stay here for the duration of this trial and I need them.

The court then instructed counsel to provide deputies with a list of the persons for whom a writ of attachment was to issue. Glen Frazier was among the witnesses listed by counsel. The judge instructed that the deputies were to tell the witnesses that their presence was demanded in court. The court then asked if counsel was prepared to proceed. This exchange followed:

MR. CALHOUN:     Well, I don't know what is going to happen to my witnesses, I hate to start a case and can't find them. I subpoenaed them to be here two weeks ago and they are not here.

THE COURT:     The court is going to begin this trial, Mr. Calhoun, and if those witnesses can't be available we will cross that bridge when we get to it.

MR. CALHOUN:     Okay, I object to starting without the witnesses present.

THE COURT:     Your objection is noted for the record.

The trial then commenced. Tr. 50-52.

The record shows that, contrary to Petitioner's testimony, defense counsel was very interested in having Glen Frazier testify as a defense witness. Counsel asked the sheriff to serve a subpoena on Frazier, and a return of service was made. When Frazier did not appear for trial, counsel requested a writ of attachment and objected to commencing the trial without Frazier's presence. In the end, Frazier did not testify, but it appears counsel took reasonable

steps in an attempt to have him testify. Under these circumstances, counsel was not ineffective in his handling of potential witness Glen Frazier.

Counsel did not list Myrtis Garner on his list of witnesses to be subponaed, and there was little discussion at the hearing about Garner. Her affidavit, on careful examination, provides little that would have been beneficial to the defense. Garner testified that Petitioner was with her and her family "all night" on December 2, 1997, but Petitioner was seen near the burglarized homes on December 3, and it is possible that Petitioner made multiple trips to the homes in the days and nights before Mr. Adair discovered the burglaries. Thus, Garner's alibi for one night before the critical night was of limited benefit. Garner's other testimony is that she looked in Petitioner's car and did not see a blanket, but there was no prosecution claim that a blanket was present at the time Deputy Staton searched the car. Mr. York testified that he saw a blanket. Deputy Staton apparently searched Petitioner's car, but he gave no testimony about that search. Staton did not even mention the search in his investigative report. Tr. 313-14.

Myrtis Garner's testimony that there was no blanket in the car would have been of some benefit to the defense. The prosecution might have argued that there were opportunities to get rid of the blanket, but that would have been an issue of fact for the jury. The question here is whether counsel's failure to subpoena and call Ms. Garner as a witness, given her limited-time alibi testimony and her testimony about the absence of a blanket, was a <u>Strickland</u> error of such proportions that the state court's denial of the claim was

objectively unreasonable. Petitioner has demonstrated, through gathering evidence, affidavits, and arguments in the years after his conviction, that counsel could have presented a much more vigorous defense, and the offering of Garner's testimony might have been part of that better defense. Of course, we have not heard testimony from defense counsel. He may have had excellent reasons for choosing not to call Garner, or he may simply have dropped the ball. The record does not let us know.

Reasonable minds could debate whether counsel's failure to call Ms. Garner, given the somewhat limited information presented by the current record, was ineffective assistance of counsel and whether the absence of her testimony undermines confidence in the verdict. But the Section 2254(d) standard of review requires more before habeas relief may be granted. It requires that the state court's rejection of this <u>Strickland</u> claim be an objectively unreasonable application of the <u>Strickland</u> principles. Reasonable minds could debate whether the state court was correct, but the undersigned finds that any mistake by the state court with respect to this issue did not rise to the level to permit habeas relief. Decisions such as this reflect the importance that state courts carefully examine such claims because the federal courts have limited authority to intervene in such matters once the state court conviction is final.

## Actual Innocence

Petitioner argues in a supplemental filing (Doc. 5) that he is actually innocent. His argument rehashes the trial testimony and argues that it, plus Glen Frazier's testimony, show

that he is innocent. It is not clear whether Petitioner exhausted this issue in the state court. In any event, a freestanding claim of actual innocence in this non-capital case is not a cognizable basis for habeas relief in the federal court. See Herrera v. Collins, 113 S.Ct. 853 (1993); Lucas v. Johnson, 132 F.3d 1069, 1074 (5th Cir.1998).

**Denial of Motion to Produce Audio Tapes**

Petitioner filed a document that asserted two "supplemental claims." The first such claim relates to a request that Petitioner filed in the state court for production of audio tapes of the proceedings taken in his case. Petitioner contends that the transcripts present an "altered version" of his trial, sentencing, pretrial hearings, and the post-conviction evidentiary hearing. Petitioner's submission to this court does not specify what discrepancies he believes exist.

Petitioner's supplemental claim is directed not so much at the merits of his request for audio tapes of the various state court proceedings, but rather his complaint that the state district court denied the motion without an evidentiary hearing or reasons for the denial. This claim fails because "infirmities in State habeas proceedings do not constitute grounds for relief in federal court." Rudd v. Johnson, 256 F.3d 317, 319 (5th Cir. 2001). An attack on the State habeas proceeding is an attack on a proceeding collateral to the detention and not the detention itself, which is the issue in federal habeas. Id. at 320. See also Drevino v. Johnson, 168 F.3d 173, 180 (5th Cir. 1999). The lack of an evidentiary hearing or reasoned decision to support the state court's denial of Petitioner's motion did not give rise to a

constitutional violation that could merit habeas relief with respect to the underlying conviction.

Petitioner also filed with this court a motion (Doc. 24) that requests a certified copy of the audio tapes of the trial and the voir dire, and transcripts of the guilty plea proceedings for the convictions that were used to enhance the Petitioner's sentence as a multiple offender. Petitioner does not explain why he wants those tapes and transcripts, and no claim based on the voir dire or the prior convictions has been presented to this court. The motion was denied in an earlier order (Doc. 26), with a notation that the court would consider whether Petitioner is entitled to the requested materials after the merits had been reviewed. That review has been conducted, and the court still finds no showing of particularized need for the tapes and transcripts.

**Witness Subpoenas**

Petitioner contends in another supplemental claim that he was denied his Sixth and Fourteenth Amendment rights when the State withheld witness subpoenas for his June 17, 1998 trial date. The record shows that the witnesses were subpoenaed for the original trial date of Monday, June 15, 1998, and those subpoenas were served. The record reflects that the trial actually commenced on Wednesday, June 17, 1998. Petitioner represents in his supplemental claim that the reason for the delay was that defense counsel was obligated to represent another client in a matter that commenced on June 15, so the court granted

counsel's request for a two-day continuance of Petitioner's trial. Petitioner complains that no subpoenas were issued for the new June 17 trial date.

It is a common practice in many state and federal courts to subpoena witnesses for two or more trials set to commence on the same day, often a Monday. Only one of those trials may actually begin on Monday, and the court often continues one or more of the other trials to commence on a day later in the week after the first trial should have been completed. The common practice is to instruct the witnesses who appeared in response to the subpoenas for the Monday trial date that they are obligated to return on the new trial date. It is virtually impossible, and horribly inefficient, to have new subpoenas issued and served by the sheriff on all of the several witnesses for a trial that will commence in a couple of days or so.

The record reflects that the traditional practice was followed in Petitioner's case. New subpoenas were not issued. The witnesses appeared on June 15 in response to the subpoenas and were instructed to return. Those instructions do not appear of record, but references are made to them, and there is the obvious fact that several prosecution and defense witnesses did appear and testify on the rescheduled trial date. Under these circumstances, the state trial court did not violate Petitioner's Sixth and Fourteenth Amendment rights to compulsory process by not issuing and attempting to serve new subpoenas when the trial date was moved two days.

Accordingly,

**IT IS RECOMMENDED** that the Petition for Writ of Habeas Corpus be **denied** and that Petitioner's complaint be **dismissed with prejudice.**

### Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 10 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 10th day of July, 2008.

MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE